The United States Court of Appeals for the Ninth Circuit is now in session. Good afternoon and welcome to the Nakamura Courthouse here in Seattle. It's a pleasure to be here. This is the time set for the case of Arizona Alliance for Retired Americans v. Kristin Mayes, Yuma County Republican Committee and Katie Hobbs and the United States of America. The parties are ready to begin. You may come forward. I understand that there's some shared time. Is that correct, Mr. Simms? That is your honor. So the plan is that I will take 20 minutes of appellant's time attempting to focus my arguments on the standing arguments. The United States will go next, also talking about standing for 10 minutes, and then the committee will argue for 10 minutes, planning to focus on the merits of the cancellation provision and the felony provision. Okay. If you're ready to proceed, thank you. Excuse me, Your Honors. Good afternoon and may it please the court. My name is Alexander Samuels. I'm here on behalf of Arizona Attorney General Chris Mayes. Like I said, I intend to focus my arguments on the standing as it relates to both provisions, and I'll start with the cancellation provision, although I hope I'll get the opportunity to talk about the felony provision as well. And argue in light of the clarification offered by Hippocratic Medicine by the Supreme Court last year, it is simply the case here that plaintiffs cannot make the clear showing of standing that is required at this early preliminary injunction stage of the litigation. We think this court's post... I have a question for you. If we were to hold that an organization has suffered an injury in fact when the defendant's conduct directly interferes with their core activities, requiring the organization to divert resources in response, setting aside perhaps a couple of outliers in our circuit, how is that any different than the organizational standing test that's set forth in Hippocratic Medicine? Well, I think one key difference is I think that's not quite the test that this court has typically applied. The second part, the diversion of resources, I think that's accurate. The first part has typically been characterized as frustration of mission, which we think is quite different than interference with core activities, which is the focus of the Supreme Court's decision in Hippocratic Medicine. If I were to use those terms interchangeably, the frustration of mission or an infringement or an impact on the core activities, then you'd agree that that is essentially the test that's been set forth in Hippocratic Medicine. Well, I think I would push back pretty strongly on the idea that those two should be used interchangeably, but I take your question to be asking if you did view them interchangeably, would things remain the same? I still think the diversion of resources aspect of this was disapproved of as well in Hippocratic Medicine, and the court spoke to that quite specifically. And I think it may be helpful for me to lay out at the beginning why exactly we think Hippocratic Medicine changed things or at least is inconsistent with this court's case law. So you're saying Hippocratic Medicine categorically says something that forces a diversion of resources can't be injured? Not categorically, but I think in the broad way in which it's applied and has been applied in some cases in this circuit, I think it doesn't work anymore. Those are you referring to when you say that the circuit has sort of categorically allowed diversion of resources by itself? So I think there have been several cases in which the diversion has been largely voluntary, and that's really the problem. So I think Sabra is a good example, and it's one of the cases that the panel opinion talks about, where the actions that were really at issue there were not directly affecting the organization there in the same way that the Havens Realty actions were affecting HOME, the organization in that case. And instead, the diversion of resources was much more voluntary on the organization's part. And that, I think, is probably or almost certainly inconsistent with how Hippocratic Medicine views the diversion of resources piece. And they spoke to it very specifically. As to diversion of resources, Hippocratic Medicine said it was incorrect, that's the word they used, to say that standing exists when an organization diverts its resources in response to a defendant's actions. And that's a quote. So the way I see it, the plaintiff, to establish standing here, they need to show that the new statute, the cancellation provision, so I'll just use that term, and I think that's the term you used, arguably requires the county recorder to cancel a person's last-in-time registration, which would then directly impair their core activity of registering voters because perhaps somebody that they registered to vote's new registration would be canceled. Do you agree with that? I think I would take issue at a couple places. One is I don't necessarily read plaintiffs to be saying that this statute will necessarily require cancellation of registrations. I read them to say that the statute at least leaves open that possibility, which I think then gets you to a more complicated causation analysis. The other point that I think is important is you used the word arguably, and I think arguably is not necessarily the standard as it relates to how this court looks at a statute in the context of the cancellation provision. The court has used the word arguable in terms of looking at statutory interpretation at the standing phase of the inquiry, but those cases in which the word arguable has been used are like the felony provision here, where it's a pre-enforcement challenge against a statute where the plaintiff is potentially facing consequences for their actions. There's good reason to apply a more liberal standard there, and the court has said many times that it does apply a more liberal standard in those cases because activities might be chilled and cases may never get to the court because people may not want to face criminal prosecution. Counsel, you had talked in footnote three to your response to the PFREB. You referred to the panel opinion and their use of the term already existing core activities, and you described it in your footnote as this temporal qualifier is dictum. I mean, we're obviously as an embanked panel looking at this anew. If we thought that under Hippocratic medicine we needed to look at core activities, what is Arizona's position as to whether they need to be already existing core activities or it could involve, for example, as you put in the footnote, core activities that the organization was imminently planning to engage? Yeah, I think our point there is that the panel opinion, in our view, if read literally there, it probably applies a little bit too narrow of a test in that an organization might have completely imminent, you know, the next day they're planning to launch a brand-new program. They've been planning it for a year, and then something happens from a defendant that interferes with that plan. I think that's probably enough. I think the point that the panel was probably trying to make is that what you can't have is an organization that decides to undertake new activities in response, and that that's where you really run into a problem. Mr. Samuels, about the in response piece, what part of that is in Hippocratic medicine's gloss on Haven's Realty? Where does that come from? Well, Hippocratic medicine at 395 does say that it's incorrect to say that standing exists when an organization diverts its resources in response to a defendant's actions. Right, but alone, right? What it's saying, and I think this was your opening point, is that that's kind of the wrong question. The diversion of resources is a diversion. The question is whether the defendant's activity interferes with the plaintiff's core business. Yes. And that would be the sum of the response, whether it interferes with the defendant's, the plaintiff's core business, right? Whether that's in the response to or not, whether it's new, for example, to get to your point about the footnote in Judge Bennett's question, doesn't matter, right? As long as the defendant's activities are interfering with the plaintiff's core business, whatever it's in T1 or T-1, whatever difference it's making, that's not the inquiry. The inquiry is whether it's an interference, right? I think that's right. So how would you define core business? If that's what you're saying, the Supreme Court seems to suggest to look at an organization's core business activities. So in response to Judge Johnstone, how would you define that? It seems that we would have to define that. Yeah, I think it's a difficult thing to define beyond the term itself, but I think it will often be pretty obvious. You look at cases from this court. Well, that's a Pollyanna thought. Well, my point is simply if you look at the cases that have come from this court, we think it's typically pretty clear what the core business activities are. And you look here, we have not disputed that voter registration activities are a core business activity in this case. And I don't think the court really needs to devise a test for that or more explicitly define it because I don't think that's really been where the crux of the issue is in prior cases if we were to apply Hippocratic medicine there. And Judge Johnstone, to follow up on your point, I really think the diversion of resources piece, I think part of the problem here in the Supreme Court's view as I read Hippocratic medicine is that too much weight has been put on diversion of resources. You asked earlier, is diversion of resources irrelevant now? And I don't think that's right. I do think diversion of resources may be part of the calculus. But as the Sixth Circuit recently observed, it's case-wide similarly to this court, really focused on diversion of resources, really made it a core part of their test, and that doesn't work anymore. And I think that's exactly the problem here. Counsel, I want to turn you back to what I think you were going to say about arguable interpretation as such and how you think that's appropriate in a pre-enforcement challenge, presumably to some kind of criminal prohibition other than like the felony provision, but I don't think you got to explain to me why you think that shouldn't be the standard here. What's the difference about the cancellation provision? Yeah, thank you very much for the question. I appreciate the opportunity to expand on that. I think the difference is, number one, that arguable standard comes exclusively from that one context. It does not appear... It appears in the dissent here as a broader proposition, but I don't think that there's broader support for the fact that arguable is the standard across the board. I think it's really important to distinguish between statutory interpretation and the merits. The merits as to the cancellation provision, is there a preemption problem here? That is the merits. But the statutory interpretation, while it's obviously going to inform the merits, is not the merits itself, and it also needs to inform the standing inquiry. So to use sort of a far-fetched hypothetical, imagine you had a new statute that regulates bats, and that's all it says. And the next day you get two lawsuits filed, one by a sporting goods store that says, this regulates our sale of baseball bats, and the other from a, say, exotic pet store that says, this regulates our sale of animal bats. One of those two parties is not injured, because the statute applies to one or the other, and the court needs to look at the statute to figure out whether there is injury. I'm not sure I get that analogy, because you're talking about if one of them said, I'm afraid that this statute is going to be enforced against me, we would be in the pre-enforcement challenge box. So what is different about the cancellation provision? What box is, if it's not a pre-enforcement challenge, it's some other type of regulation that won't be enforced against any private party? Is that the distinction you're making? Is it, you know, that there's really no threat of a, no violation, I guess, by a private party that's going to happen that they could be afraid of? Is that the distinction you're drawing? I think the point's a little different. I take the point that that hypothetical could be sort of drawn into the pre-enforcement context. We could add details, but set that aside. The core point is that in the hypothetical, the court needs to look at the statute and interpret it in order to determine whether there is any injury, which is the number one thing you're asking at the standing inquiry. In the pre-enforcement context, we don't. We very much say that we're not going to actually decide whether, you know, whose interpretation is correct. And we've talked about the bizarre situation in which essentially the party's, you know, interpretation of the statute is reversed in their standing arguments as it would be on the merits or in their own self-interest. But what I thought you were saying is this isn't a pre-enforcement challenge, and that's why we, but I'm trying to understand if you can put a finer point on it. Why is the challenge to the cancellation provision not a pre-enforcement challenge? Why doesn't it fit into that box? Well, because in a pre-enforcement challenge like you have with the felony provision here, it's a direct regulation of the organization and its members in this case. And I think that's the fear is that, you know, they're facing prosecution under a criminal provision. And pre-enforcement cases in the context we're talking about, and I think that word sometimes gets used more broadly, but in this specific context, that's what you're talking about. It's a direct regulation of the plaintiff. That's not the cancellation provision here. So I'm trying to understand, you know, I get your point that arguably requires or arguably allows the county recorder to cancel. It's not the test. But I think what you're really getting at is that the injury that the plaintiffs are alleging is too speculative. The bottom line is that we need to look to see whether it is likely or possible. And so I guess I want you to sort of tell me what is your best argument for why the allegation that this could happen and then result in an impact on their core activities is too speculative.  I think there are other problems that they have and that I think a lot of their, like, if you look at the declarations below, a lot of it is directed at diversion of resources and frustration of mission. But to answer your question... You said you're not arguing, and I just want to make sure that I understand this, to Judge Johnstone's point, you are not saying that a diversion of resources can't be part of the equation for purposes of developing injury. In fact, you're saying that you have to have the diversion of resources connected to an impact to the core activities. It's the injury plus the causation piece. Well, I think really the core point is that the way that the test has been applied in this court is once you prove a frustration of mission and diversion of resources, you're there. And that's the end of things. And I think that doesn't work anymore, even if diversion of resources may be a relevant part of the calculus. That's all I was saying there. It may be relevant, but it would probably be unnecessary. I mean, in the context of the arguments relating to the felony provision, the plaintiffs here don't have the same type of standing issue that they have with respect to the cancellation one, but you could say if they have standing there and they face a risk of reinforcement, that maybe they're diverting resources in the course of trying to figure out whether the felony provision applies to them and adjust their conduct accordingly. But we don't need the diversion of resources. That's just kind of an additional way of thinking about it. But if they already have standing and add to the felony provision, the diversion of resources doesn't add anything. Well, I think that's mostly right in the sense that what I was trying to get at in answering Judge Johnstone's question is that the core inquiry is really not focused on diversion of resources now. It's focused on the interference with activities. And as it relates to the felony provision, I think there are several other problems with plaintiffs' standing here beyond any statutory interpretation questions where we think they have a problem. But we think the panel opinion on that front, on standing, really reads out the other Thomas factors that Thomas has said really are important, including whether there's been a real threat of enforcement and whether there's any history of enforcement. The panel opinion, I think, seizes on the first factor, which is whether there's a concrete plan to violate the law, and really stops its analysis there. And we think that's problematic. Well, Tom, if I understand your argument about the cancellation provision correctly is that it's really just not regulating private conduct at all. It's really a reflection of what the state's sort of internal process is for processing voter registrations. And that's why the whole rubric of standing that we've developed in the pre-enforcement context is not applicable. Am I understanding your argument correctly? I think that's right. I mean, the direct regulation of the cancellation provision is of government actors. It's not to say that there couldn't be some effect on private actors at some point. I want to be clear about that. But it's not like a private citizen could ever be hauled into court under that provision. No, certainly. It's very distinguishable from the felony provision in that way. And then I know there are other questions, but I do want to just talk about the credible threat analysis for the felony provision. My understanding is that there is relevant disavowal here. So you are speaking for the state when you say that the state does not interpret the felony provision in the way that plaintiffs fear. Well, I want to be clear. I speak for the Attorney General. There are county attorneys who have prosecution authority in Arizona. They were not named in this case, though, so I don't. You're speaking for the State Attorney General's office in Official Cassidy.  And it would be that specifically that mechanism for voting does not include registering voting and that the state is unequivocally or their client is unequivocally disavowing enforcement against individuals who merely engage in voter registration. That's right. And I think importantly, it's not just my boss who has said that, but her predecessor as well. It's two consecutive Attorney Generals of different parties. It's hard to imagine how you could have more clarity on this from the Attorney General. And Mr. Sam, what's your best case to support your argument that the AG's disavowal of enforcement of the felony provision against voter registration actually supports a finding of no standing? I think the best is Johnson v. Stewart, which is the case about Oregon textbooks. There the court, I mean, in part to my point earlier, the court looked at the statute and interpreted it, found that it did not apply to the teachers who were the plaintiffs in question there and included language that said the Attorney General of Oregon has repeatedly disavowed any interpretation of the statute that would make it applicable in any way to teachers. And I also think there's a second important point, which is the failure to disavow has been really important in other cases. And if the failure to disavow matters, we think that disavowal has to. Can you point to any representation or other guidance from your office, not including the litigation documents, that make clear that the felony provision will not be enforced against plaintiff organizations for their voter registration activities? It has been in the context of this case. There's not been separate formal guidance. I think there was a suggestion at one point that there could have been an opinion from the Attorney General. That actually only happens in response to a request from a state official, which hasn't occurred here. And the statute was enjoined right at the beginning. So, I mean, it would have been, I think, it wouldn't have made a lot of sense for either the prior Attorney General or the current one to be talking about this very much outside the context of this case, which was the immediate focus. Well, Mr. Samuels, the Secretary of State has also asked, the prior Secretary of State asked us to adopt an interpretation to say that if you don't have standing, because this doesn't apply to you, that is also our, at least our tentative reading of that law, right? Right, that it would not apply to the plaintiffs. Yeah. Mr. Samuels, in your view, which elections procedure manual governs the analysis with respect to this plaintiff's standing in this case? Yeah, I think it's tricky at this point because in the district court, the district court was appropriately focused on the 2019 election procedures manual. There has since been another one, as your Honor likely well knows, that was enacted in 2023. I think in particular, because of the preliminary injunction posture, it's a little tricky to say that the 2023 EPM doesn't matter at all. It's a little hard to kind of put blinders on and ignore it. I'm not sure there's significant relevant differences for the analysis here, though. I agree with you, and I think for purposes of the provision that I'm sort of focused on in the EPMs, both the 2019 and the 2023 manuals have language that deals specifically with the merging and cancellation of registrations. And I wanted to ask you, you know, the county recorders are bound by the provisions in the EPM, and it discusses EPM, both versions, regardless of the one we're looking at, talk about the merging and cancellation of duplicate records. And there is a number of things in the record that the defendants have put in that talk about sort of the continual handling of registrations that are made in two counties, and this is not something that has just started to happen since the enactment of this particular piece of legislation. Persons in Arizona have been moving from county to county and registering. And so I just want to clarify that it's your position that that merging and cancellation of duplicate records is the process that is used now just as it was previously? Yes, that's right, Your Honor. And I think that process was largely the result of several other provisions of law. It was kind of the inevitable result even before this statute would have ever been in effect, even though it's been enjoined. And are counties required to maintain records of any cancellation? I believe so. I actually don't know the answer to that for sure, but I do believe so. I believe so, too. And are you aware of any instances where a county recorder has canceled a last-in-time or a new registration of a person as opposed to the first-in-time or an old registration? I don't think there's been any evidence presented of instances like that, and I'm not aware of any separately, Your Honor. Okay. And the EPM includes procedures that counties have to follow before canceling a voter registration based on a change of address, the NCOA process. Do those provisions apply to cancellations under this new statute, 16-165? Well, I think the new statute is largely aimed at the same thing, which is voters who are changing address. And so I think, I'm not sure this is directly responsive to your question, but I think the important point here is really nothing has changed, and the Secretary of State avowed that in the district court below during the stay briefing, which is that with or without this law, the procedures were the same. Thank you. Yeah, I have, with regard to, sorry, the NVRA, does the Attorney General have a position as to whether the language in the NVRA, unless the registrant confirms in writing, means that there has to be direct communication between the registrar and the voter, or what Judge Lee put in his concurrence, reading it a different way, something else or no position? Yeah, I'll largely defer to Ms. Olson on this, who's planning to talk about the merits. I will say the Attorney General has joined in the merits arguments here, and I think one of those arguments is that there is not direct communication required with the prior county recorder, so long as that county recorder has documentation in front of it that shows that the voter has signed a new registration. Along the lines of the concurrence that Judge Lee wrote. Yes. Okay, thank you. Thank you. Thank you. Good afternoon, Your Honors. May it please the Court. Sean Janda for the United States. I think it might be helpful to start this morning by taking a step back, just to articulate the two principles that, taken together, I think resolve the organizational standing question presented by this appeal. Number one, as the Supreme Court has long made clear, no plaintiff, organization, or individual has a cognizable interest in his moral or ideological views, and so doesn't suffer an Article III injury when a defendant takes actions that impair those policy preferences. And then second, no plaintiff, again, individual or organization, can generate injury where none previously existed by choosing to expend resources in response to a defendant's conduct. And that's the principle that the Supreme Court articulated particularly clearly with respect to organizations in Hippocratic medicine. And I think if you put those two principles together, that's sort of exactly the theory of standing that the plaintiffs here are advancing. So on the front end, I don't take the plaintiffs to argue, consistent with that first principle, that they themselves would suffer an injury if an Arizona county recorder accidentally canceled a voter's wrong registration at some point in the future. The voter would certainly be injured. That would be contrary to the plaintiff's moral, ideological policy preferences, but it wouldn't directly injure the plaintiffs. And so if that doesn't directly injure the plaintiffs, the plaintiffs cannot then generate a cognizable injury by choosing to expend or divert resources to ameliorate the possibility that that will happen in the future. But diversion of resources can still be relevant to the question of whether this impacts their core business. Can it or do you disagree with that? So I think Judge Bress may have hit the nail on the head earlier, which is that if you have an injury, a direct injury from the defendant's conduct, the fact that you are expending or diverting resources may well be sort of evidence of the effect that the defendant's conduct has on you, and it may well help illustrate that injury. But you cannot, if there is no injury in the first place, you cannot spend your way to standing by expending resources to generate an injury. And so I think what the plaintiffs are really lacking in this case is identifying that sort of first injury or the baseline injury that they are then saying they will expend resources or divert resources in response to. And without that, then, I think, the whole standing claim just falls apart. Well, there is essentially an argument that, or a concession, that it's undisputed that a core activity of plaintiff organizations is voter registration. So if the law, I think the theory of injury here is that the law effectively requires them to change how they provide that core service. That, to me, is categorically different from the mere policy advocacy discussed in Hippocratic Oath or truly voluntary diversion of resources, because if they just kept on registering voters in the same way that they always have, they would not be doing it accurately. At least that's the theory of injury being promoted. So I don't think that's the theory of injury, Your Honor. I think the theory is that if they continue doing what they were doing before, it would be less effective in some sense because some number of the people who they register may end up having their registrations canceled down the line. But I think, sort of going back to the first principle, if that happens, and I think the court can assume for purposes of this argument that the challenge law may lead that to happen in some number of circumstances, it's hard to see how the plaintiffs themselves are injured by that cancellation down the line, by the cancellation of a voter's registration, a voter who is not the plaintiff. The voter is certainly injured by that. The plaintiff, as a third party, is not injured by that. How is that different from Haven's Realty, where technically the organization that was just providing housing referral information, they weren't directly injured by someone who came to use their services not getting the apartment they wanted. Really, it was just the service that they were providing was being impaired by the allegedly unlawful conduct. So I don't think that's correct. And as an initial matter, the Supreme Court in Hippocratic Medicine described Haven's as an unusual case that shouldn't be extended beyond its context. And I think a key part of the context in Haven's is that the organization there asserted that they had their own legal right to truthful information from the defendant, that the Fair Housing Act gave them the legal right to receive truthful information, and the defendant impaired that legal right by providing their employees untruthful information. And so the place that the organization in Haven started was with that direct interference from the defendant. How do you square your argument that you're making right now with the Fourth Circuit's decision, the RNC case, from just several months ago? I'm not sure that I prefer to speak specifically about the RNC case, Your Honor. We haven't taken a position on that. Well, I think the problem with your argument is that if the... So in the RNC case, you have the same situation where you have an organization that is registering voters or has an interest in particular members of their party being able to have a valid registration to vote, and they allege and ultimately are found to have standing by the Fourth Circuit based on the fact that they're worried that their core activities, which is registering voters, will be impacted negatively by the conduct of the government in potentially canceling registration. So I don't want to speak specifically to that case without having the opportunity to read it and sort of understand exactly what the Fourth Circuit's reasoning is. But I think that the core principle, again, is that nothing about what the organizations are actually doing is regulated by the cancellation provision. And a helpful counterpoint here is the felony provision, which at least in... What you're basically arguing for is no organizational standing, then. You're saying that only individuals who have direct injury to themselves are able to establish standing to bring a claim challenging the cancellation provision. So I think the Supreme Court made very clear in the Hippocratic Medicine that only a plaintiff who experiences a direct injury to themselves may bring a suit, setting aside sort of the limited associational standing theory where an association might step into the shoes of a member who himself or herself has standing. And I think an organization can be directly affected, and the felony provision is a very helpful counterpoint here. Right, but the Supreme Court has drawn a distinction between direct injury and being directly the object of regulation. So you can be not the direct object of regulation, but be...suffer an injury. So that's true. There are some limited circumstances, and I think the Supreme Court has been very clear that it's substantially harder to establish standing when you are not the object of the defendant's conduct. And here, I mean, again, it's not just that the plaintiffs aren't directly regulated. It's that the plaintiffs don't have an independent, legally cognizable interest in whether any particular voter, even one who they sort of help sign up to vote, whether that voter maintains his voter registration. And I think a helpful, again, helpful analogy here might be the Supreme Court's Kowalski case, which we discussed in our brief. And there, I think the Supreme Court makes it very, very clear that lawyers don't have an independent litigable interest in the laws that affect their clients. And so, you know, the Supreme Court says in that case, you know, an organisation of medical... Sorry, a medical malpractice attorney could not sue to challenge a tort reform statute because the tort reform statute doesn't directly injure the attorney, even if the attorney, you know, might choose to... expend resources to develop new arguments or to change the way... I ask you the same question I ask counsel for the attorney general. In the NVRA, does the United States have a position as to whether the language, the registrant has changed residence unless the registrant confirms in writing that the registrant has changed residence means in every case that there has to be a direct communication with the registrant or as per Judge Lee's concurrence that that confirms can be satisfied in other ways? We have not taken a position in this case on any of the merits questions, including how the NVRA applies to the challenge law. We are sort of focused in this case only on the organisational standing... Mr. Janda, then on that point, and I don't know whether you're prepared to speak on any of the other cases, but if we look at the other courts of appeals that have addressed standing issues in the wake of Hippocratic medicine, some of them find standing, some of them don't find standing, but none of them frame the issue as whether the crux of the inquiry is whether it is in response to... that's disqualifying, that it's a diversion of resources in response to. They'll frame it, I think, as you suggested, about whether, as Hippocratic medicine says, whether it interferes with the core business activities. So whether it was in response to is kind of a sidelight here. I mean, can you show with respect to... because the panel opinion emphasised the point in response to. If it was in response to, then that was kind of a danger sign. Can you identify any other court of appeals that's taken that approach as opposed to asking the question that the Supreme Court did, does it interfere with their core business activities? I wouldn't say exactly how I read the panel opinion. I think the panel opinion, and certainly we think the Supreme Court's opinion, again, is focused on whether there is a direct injury from the defendant's conduct, and the plaintiff can't generate an injury by expending resources in response. But if you have that injury, I mean, I don't think you need... if you have that injury, you are injured, and you can bring a lawsuit, I don't think you need to divert resources or expend resources to generate the injury. But certainly, you know, the expenditure of resources, the diversion of resources, however you want to frame it, can be, I think, helpful evidence of showing the direct effect that the defendant's conduct has on your activities. But it's not itself, I think the Supreme Court makes this very clear, going to generate standing where it not exists. And am I missing any other... I mean, maybe you don't... we've talked about the Fourth Circuit case, the Fifth Circuit Deep South case, the Sixth Circuit Tennessee Conference of the NAACP case, the Third Circuit Pacific Legal Foundation... Yeah, I'm certainly not aware of any court that says, you know, if you're injured by a defendant's conduct and you choose to divert resources to try and ameliorate that injury that you don't have standing, I don't think that would make any sense, and that's certainly not our position, and that's not how we read Hippocratic medicine. I think once you have that injury, you're into court and you're fine. The question is just whether you can generate it if it doesn't exist in the first place. Could you give an example of that sort of injury? I know that Hippocratic medicine referred to a retailer injured by a manufacturer's defective product as an example. What was an example that you would agree would be a direct injury? So I think that's the helpful analogy that the Supreme Court used in thinking about Stevens Realty, which certainly the organization there experienced a direct injury because it was provided defective information directly by the defendant, and that's a direct injury to the organization. I think the cancellation, or sorry, the felony provision in this case is another sort of helpful example if you take the plaintiff's view of how that provision works. The provision, in their view, directly regulates the activity that they're engaging in by exposing them to potential criminal enforcement based on the way that they are registering voters, and so that's directly affecting or regulating the activities that they're engaged in. It's not affecting or regulating third parties like the voter registrants themselves that just then sort of has the follow-back of the organization. Were not the employees testers? I mean, in other words, the employment relationship didn't turn on as much as the fact that they were affiliated or that the organization worked on behalf of the people who got the misinformation and those similarly situated. I don't think so, Your Honor. I mean, the organization there have both sort of clients and employees, and obviously an organization sort of acts through people like its employees, and so there, I mean, I think, and the way the Supreme Court conceptualized this in Democratic Medicine is that the employee sort of standing in for the organization was directly given untruthful information like a retailer who was provided a defective good by a manufacturer, and so that sort of direct injury on the employee in his employment, and therefore the organization, I think is the baseline thing that generated the standing in Haven. So in your view, if it had been Haven's say, black clients that had been provided the information and not their employees, you think they wouldn't have had standing? I think in that circumstance, certainly setting aside questions about sort of tester standing, the people who received the untruthful information might well have standing. The organization that sort of has a moral, ideological policy interest in helping those people wouldn't have standing independent of their ability to sort of stand in the shoes of those clients, and so here, again, I think there's a really key legal distinction between the voters who the plaintiffs might help and the plaintiffs themselves, and the voters absolutely have a legal interest in not having their voter registrations cancelled, and if their registrations are cancelled, I'm sure they would have standing to bring suit, but the plaintiffs, as kind of third parties, like the lawyers in Kowalski helping their clients, don't have an independent interest in what happens sort of down the line with the voters. Thank you. Thank you.  Chief, panel, may it please the court, Tracy Olson and Brett Johnson on behalf of Yuma County Republican Committee. I'd like to try to reserve two minutes for rebuttal. To the extent this court finds standing, it must reach the merits of the felony and the cancellation provisions. Plaintiffs ask this court to read the challenged laws in isolation, but central to the interpretation of both are their statutory context. The relevant statutory context here is the entirety of Title 16, which sets out a comprehensive framework for the administration of elections, including subjects such as voting and voter registration. Title 16 is supported by Election Procedures Manual, which is a document published every two years by the Secretary of State, and does carry the force of law. The cancellation felony provisions are just two pieces of this overall election framework in Arizona, and when they're read in their statutory context, any ambiguity or confusion simply does not exist. As observed by the entire panel, the felony provisions phrase mechanisms for voting when read in the statutory context is not unconstitutionally vague. Mechanisms for voting refers to casting a ballot, and this reading is confirmed by the example in the ARS 16-1016 text and title, both of which refer to illegal voting, not illegal registration. In fact, the legal voter registration activities that plaintiffs claim fall into the scope of the felony provision are criminalized by a completely different statute. At bottom, registering to vote and voting involve different processes with different consequences. As for the cancellation provision, its statutory context also supports a finding that there's no conflict with the NBRA. Can I just ask a question? As for the cancellation provision up here, plaintiffs argue that it is unclear, based on the statute, whether the county recorders would counsel the older or newer voter registration. Can you help clarify your understanding of how the provision would work in practice? Yes, Your Honor, and I think if we take a step back and look at the framework that the statutory context gives us, it starts with kind of a four-step process. The first is the county recorder receives the registration. That's established by ARS 16-164, and the county recorder then is supposed to update that process. That statute specifies between new and old registrations. Then, later in that statute, it talks about notating the cancellation. But 16-164 doesn't actually authorize the cancellation. It just instructs the recorder to notate it. I don't think that the statute uses the word old or new. I don't think any of the statutes that you're referencing or the provisions in the EPM say old or new. Instead, they talk about the uploading of registrations and then the sort of merging and cancellation of duplicate records. ARS 16-166 does discuss the receipt of the new registration form and updating the... I'm sorry, I thought I heard you say 164. 164 also talks about the new registration form as well. It talks about the receipt of a new registration form. They both talk about when you receive a new registration form, and you're correct. I see what you're saying. You're talking about when you have just a single registration form. You're not talking about the reconciliation of duplicate records. Well, I think ARS 16-164 speaks to the reconciliation of duplicate records. I think your comments earlier today are instructive, and the EPM walks us through this. In our view, the EPM is codifying what these statutory steps say. The one difference between the EPM and what was happening here with the statutes is that there was an express cancellation provision of what was happening in 16-164. It does reference the new registration form there, and it talks about modifying that record of registration to reflect the changes of addresses. Then it goes on to say that then they're supposed to notate the cancellation of the old registration. In our view, 16-165 supplements 16-164 in order to authorize what's already happening. In response to Chief Judge Merguia's question, this is the process that has been happening with the county recorders for time in memoriam, correct? That's what the record supports, yes. Another question that was asked earlier was about whether or not there's direct communication with the voter and the county recorder. That's not necessarily what the NVRA requires. I think it's instructive that the NVRA uses the word state shall not remove the name of the registrant. If you look to the NVRA, it talks about how the states are supposed to manage their responsibilities under the law, and it delegates that task to the Chief Election Officer in the state. In Arizona, that's the Secretary of State. The Secretary of State manages that through our statewide voter database, which is established by ARS 16-168J, and the county recorders manage that statewide voter database. When county recorders receive something, it's done on behalf of the state for purposes of the NVRA, and I think that's completely consistent with the text of the statute. I heard you say, do we have to decide the felony part of this? You said we had to. If you find standing on the felony provision, you would need to reach the merits. I thought this was before us on the organizational standing, but we have to decide that part of the case as well. Well, Your Honor, the panel decision was vacated completely, so that issue has been vacated. There's no guidance on that issue at this point, so we think the panel concurrence has a good interpretation of the felony provision and would invite this panel to adopt that analysis as to the interpretation of what it... The felony provision, that was dealt with in the case. Correct. But it's vacated, so we would have to, if we conclude their standing on that, we would reach it? Yes, Your Honor. One of the other questions that was asked was related to... I just want to return back to the cancellation provision and understanding what's happening here. I think even if this panel disagrees that the counter-recorders can collectively manage the state's responsibilities under the NBRA, I think this is still consistent with the Seventh Circuit cases. If you look at the end of League of Women Voters v. Sullivan, it talks about how there's no problem under the NBRA when officials are passing along a voter's registration or a sign-sworn statement, and that's exactly what would be happening here, is that the sign-sworn statement that comes from the voter is being passed along between counter-recorders. But before we get to D1, which is where the panel concurrence suggests that the NBRA has no conflict, it's our position that Arizona's system complies with A3A of the NBRA, and the reason for this is because in Arizona, voter registration is what we call a pick-one paradigmer. And what I mean by this is that you can only be registered to vote where you reside, and you can only reside in one place for the purposes of voting. And thus, a person can only be registered to vote in one place, and because you have to pick one, the submission of a sworn registration form, which is supported by proof of residence, by registering in that new county its request to cancel that old registration. And that's supported by the House and Senate reports that we submitted with our briefing. As to the felony provision, one other point I wanted to speak on before I sit down was that actually I'm going to reserve the rest of my time for rebuttal. Thank you. Yes, just one moment. Okay. Thank you. Please go ahead and proceed. Thank you. Good afternoon, Chief Judge Muguia, members of the panel, and may it please the Court. My name is Aria Branch on behalf of the plaintiffs at Police. This case presents an important threshold question. Do voter registration organizations like the plaintiffs here have standing to challenge a law that undermines their work by increasing the likelihood that voter registrations will be canceled and that will in turn make it harder for them to successfully register voters? So in order for you to I think succeed on your argument that you're making here, and I'm just going to focus on the language that you just used, you have to be able to show that there is going to be conduct on the part of the defendants that makes your work, the plaintiff's core activities of registering voters impaired or negatively impacted. So you would agree that you have to establish at a baseline that the cancellation provision is likely to result in county recorders canceling the last in time registration of voters that you've registered, correct? We would agree that the operation of the cancellation provision needs to result in the cancellation of the voter registration of an individual, of the voter registration that an individual intends to use, which is likely going to be their last in time voter registration. So assuming that's true, and I think that's right, help me understand what best evidence that you have in the record to establish that that is something that is likely to occur and if it is just the plain language of the statute that doesn't use the words first or last or new or old or first in time and last in time, if that's really all that you're relying on, which is sort of what I understand your argument to be because the language may not be as clear as you want it to be, what do we do with the mountains of evidence in the record that has been put in by the defendant that that's never been done that way, that there are provisions in the EPM that articulate a process for county recorders to merge and cancel duplicate records which have been happening for a long time in Arizona and that there are declarations and statements from the Attorney General, the Secretary of State, and the county recorders to that effect. So in our view, the cancellation provision requires the cancellation of registrations based on just the normal operation of state law and this was what the dissent pointed out and I think it is extraordinarily important for this court to bear in mind that there are two discrete prongs of the cancellation provision. The first is the one that the defendants have focused on throughout this case and that is the one that requires an Arizona county recorder to cancel a registration when they receive confirmation that a voter has registered to vote in another Arizona county. The second discrete prong of the cancellation provision requires a county recorder to cancel a registration when they receive credible information that a person has registered to vote in a different county. But there's a second part to that. It isn't just that they shall cancel the registration when they get that credible information. They then have to undergo the process that they would in the first instance, which is to confer with or receive confirmation or do an investigation that involves looking at the database and communicating with the county recorder from the other county. I think the important thing to focus on with respect to that second provision is the fact that it can and the Secretary of State has interpreted it this way, that it also applies to out-of-state registrations. For example, if someone is registered to vote in California and they move from California to Arizona, they register to vote in Arizona, an Arizona county recorder may receive credible information, which is not defined in the statute, that that person remains registered to vote in California because they didn't affirmatively cancel that registration. The cancellation provision only requires the county recorder to reach out to confirm that the person remains registered to vote in California and according to the cancellation provision, they are then required to cancel that person's Arizona registration. That is the interpretation of the cancellation provision that the Secretary of State agreed with below, which is why we think it is an arguable interpretation and because of it, because third parties can provide information to Arizona county recorders that individuals are registered in other states, that can force registrations, which our plaintiff organizations have to respond to because they are in the business of voter registration, that is essentially the cancellation provision requires undoing their work, they have to respond to that. Is there an example in the record of that having happened that a later in time registration in Arizona was canceled because of a previous registration in California or Nevada or somewhere else? There is not an example, but of course the cancellation provision did not go into effect. It was enjoined on I think the first business day after it went into effect. Let me ask you this. You would agree that recorders need to maintain information in the record with respect to cancellations, correct? Yes. So there have been instances perhaps maybe not under this particular statute where an individual's voter registration has been canceled because they were they moved from another state or from another county, right? Have there been any instances that you can point to where a last in time registration was canceled even before this provision was put into place? So I don't think it's in the record. There have been public reports of this having happened and I think actually a council, I think a prior council to the Attorney General. There's nothing in the record that we can look to. There's no evidence that's been put forward by the plaintiffs here that they're relying on this concrete information or past practice where a last in time registration has been canceled. That's correct, but the cancellation provision and in particular that second prong of the cancellation provision which requires cancellation based on credible information is new. No one has argued throughout this litigation that county recorders in Arizona have ever been required to cancel registrations based on receipt of credible information from their charges. I think the state had framed at some point that what this law attempts to do is codify pre-existing practices and I think Judge Josiah was getting at, well, if these were going on previously under substantially similar guidance, why wouldn't we have anything in the record showing that it's happened? The district court was correct when it concluded that the cancellation provision does not codify existing practices. The EPM, the 2014 EPM that the defendants have relied on throughout this case sets forth a matching process that won that 2014 EPM is no longer in effect and it's not detailed in the cancellation provision. The 2019 EPM and the 2023 EPM has the same language with respect to the reconciliation of duplicate records. To be clear though, the second prong of the cancellation provision which allows for the cancellation of registrations based on credible information, no one has argued that that is codifying any existing practice whether in the EPM or an existing statute. That part of the cancellation provision is new and that part of the cancellation provision is the one that operates with the most risk of injuring our plaintiffs because it increases the likelihood that a new in time or later in time Arizona registration can be canceled. So, Ms. Branch, you talked about your plaintiffs filed this case in September of 2022. Any effort to find voters who would avoid this organizational standing, Ms. Warren? We have not obviously amended our pleadings to find voters. The cancellation provision has been enjoined for the better part of the litigation and obviously it didn't go into effect so we have not identified an individual. I don't think that's required at the preliminary injunction stage and no one has argued that it has been. Well, it isn't required if you've been able to show organizational injury under Hippocratic Medicine. Right, and we think we have because the cancellation provision explicitly impairs the plaintiff organization's voter registration activities and the Attorney General, the defendants do not dispute that the plaintiffs are engaged in voter registration activities and that the cancellation is our view that the cancellation provision essentially undoes their work as a result that they have had to change their practices. Can I just add a question on that because the way you framed your injury just now seems to be precisely the argument that the Supreme Court rejected in Hippocratic Medicine. That was exactly what they were claiming there and the Supreme Court said that's not enough. I wanted to ask you about are you claiming an informational injury here? We are not claiming an informational injury. Our injury is based on injury to our core activities. I just want to walk you through and read with you and have you respond to the Supreme Court's decision. They talk about Haven's Realty and then they compare it to that case and they say, this is the quote at 1564, but the associations have not claimed an informational injury and in any event the associations have not suggested that federal law requires FDA to disseminate such information upon request by members of the public. That's how they distinguish the case. They then go on to say Haven's was an unusual case and this court has been careful not to extend the Haven's holding beyond its context. Why shouldn't we, in light of this language from the Supreme Court, limit Haven's to the context of the informational injury? I think that what the Supreme Court meant when it said it has not extended Haven's beyond its context is what it said in Hippocratic Medicine is that it has not extended it beyond injury to an organization's core business activities. That is the context. That doesn't seem to be consistent though, counsel. Your answer doesn't seem to be consistent with what I just read to you. It says the reason Haven's does not apply is because the plaintiffs have not alleged an informational injury. And if you agree that you haven't alleged that injury, then I don't understand. Now maybe you can win under some other case, but it strikes me that what the Supreme Court just said is Haven's is limited to informational injuries. Maybe you can satisfy the standard in some other way, but Haven's isn't going to provide you the avenue to do that. I don't think that Haven's is limited to informational injury. I think Haven's set forth a standard three-part test for organizational standing. I think organizations are held to the same standing requirements as individuals, and there's nothing in Haven's or Hippocratic Medicine that require an organization to suffer an impediment to a legal right. In any event here, we have brought NBRA claims, and under the NBRA, any aggrieved party can bring a claim. And so we do argue that our legal right of ours has been impaired under the NBRA. What's your best authority for the NBRA standing? Under the NBRA, it was statutory standing, because any aggrieved party can bring... But that doesn't get us around the Article 3 inquiry. So is there a case where courts have held an NBRA statutory standing? What's the intersection there that would meet the Haven's test? I'm not sure that it is just an informational injury. Three sentences above, it says that it's still about interference with core business activities, but still, wouldn't you still need to meet that, even if you're asserting just a statutory standing? Sure. You still have to meet Article 3 standing. My point is just that to be clear, I don't think that organizational standing is limited to impairment of a legal right. I don't read Haven's that way, and I don't read the Supreme Court's decision in Hippocratic Medicine to limit Haven's that way. I think the limitation is what Your Honor just articulated, which is plaintiffs have to show an injury or an impairment to their core business activities. By your theory, imagine I have an immigration law firm, and I'm trying to help people get immigration relief, and the government enacts a rule that makes that kind of relief harder. Does the law firm have standing because this has now made the law firm's work of securing asylum or withholding of removal or cancellation of removal more difficult? It may have standing if the law actually does impair the organization's core business activities. You would say that includes the law firm's work in applying for asylum, for example, on behalf of clients? I think that if an organization and this is the El Rescate case, if an organization as in that case, if the government passes a law that makes it more difficult for them to provide their services and impairs their core business activities, and I think under Haven's and for Hippocratic Medicine, there can be standing. It obviously would depend on that. We were told that this kind of standing is an unusual case, but there's lots of organizations that are helping people do something, including law firms and many other types of organizations, and by the logic of your position, lots of people, lots of organizations would have standing to challenge lots of different things, and that seems to be kind of counter to what the Supreme Court just told us. Well, I think that is the test that the Supreme Court laid out. It is that a plaintiff can have standing if it shows that it meets the three prongs, and particularly with respect to injury. In fact, there has to be injury to the organization's core business activities. There certainly are limitations on standing, and they're set forth in Hippocratic Medicine and many of this court's precedence in that an organization cannot seek to just vindicate its abstract social interests. It can't spend resources on advocacy or on lobbying just because it doesn't like a policy, and argue that that impairs their core business activities. They actually have to be engaged or planning to be engaged in some type of activity that the challenged law or practice impairs or interferes with. Even taking just the one example of a law firm, this would mean that essentially law firms could challenge any law because law firms are always helping people comply with the law or to try to get things under the law. Well, I think there may be other prongs of the Article III test. For example, causation and redressability may be issues there, and obviously it would turn on the specific facts of the case, but as a general principle, I think what the Supreme Court has said in Hippocratic Medicine is that injury to core business activities is sufficient to challenge Article III. It seems to me that if you would say that an immigration law firm would have standing to challenge a change in immigration law, and because it makes their work on behalf of non-citizens more difficult, then there's definitely going to be causation and redressability all the time. I don't really see that as much of a limitation. I think it depends on what the immigration law is. Obviously, the Supreme Court also said in Hippocratic Medicine that standing cannot be made easy. It turns on the specific facts of a case. It's not a mechanical exercise, especially when it comes to causation. I think that the rule has been set clearly by the Supreme Court in Hippocratic Medicine, but the specific facts of a particular case will determine the outcome of that case, the application of the rule to the specific facts. Ms. French, I want to ask you about the felony provision. Why doesn't the Attorney General's repeated disavowals of enforcement establish that there's no credible threat? Because those disavowals have come solely in the context of this litigation, and there's a binding precedent in the Lopez case that makes it clear that litigation disavowals do not defeat standing. You argue that the self-censorship that the plaintiffs have engaged in is sufficient, but in the cases that you cite where self-censorship is sufficient, it's accompanied by silence on the part of the government. Here we have these expressed disavowals. Doesn't that make a difference? I don't think it does. I do think that to the extent that the Attorney General's disavowals are not binding on future Attorneys General. What about the county prosecutors? They could bring this to? They could. They didn't sue the county attorneys. We didn't sue the county attorneys. We sued the Attorney General. We cite in our briefing the case Artichoke-Jones. We don't think that, which stands for the proposition that it is reasonable to assume that if a law has been declared unconstitutional and the Attorney General is prohibited from enforcing it, that county attorneys won't enforce an unconstitutional law. If they do, certainly we could bring suit against them. As we argued below, we were not required to sue every potential source of injury. Partial redressability is sufficient under the Wild Earth Guardian case. Does the Attorney General's disavowal bind the county prosecutors? I don't think it does, but I do think that it is obviously helpful to point to if a county attorney were to try to prosecute one of my clients for engaging in voter registration activity of an individual who's registered to vote in another state. It would be helpful if the Attorney General had disavowed. That would be something that we could point to in potential litigation against that county. Should that affect that decision not to sue the county attorney? Should that affect our analysis of whether the plaintiffs have standing to challenge the felony provision? I don't think it should. It's only relevant to redressability, and partial redressability is sufficient. That is the Blackletter Law and the Wild Earth Guardian's case, which we cited in our briefing. One of the other prongs for standing for the felony provision is the history of past prosecution. I know you said this law is new, but there's other evidence that similar laws have been placed. Is there any history or analysis history of past prosecution? Not with respect to the felony provision, because it is new and the district court was clear below. In other cases, courts have been clear that when plaintiffs are challenging a new law, that prong of the credible threat of enforcement test falls away because there is nothing to rely on in terms of history of past prosecution. Can I come back to the question about informational standing? Just assume that I were to interpret Havens and what Hippocratic Medicine said about Havens to cabin Havens to informational standing injuries. You're correct that the test generally is impact on the court business practices. Outside of informational injury, which apparently satisfied that test, the Supreme Court has said, can you point to any other Supreme Court precedent of an injury that has satisfied core business practices other than Havens? I can't think of one off the top of my head. I do think Havens is the best example of this. I also think that Hippocratic Medicine doesn't change the conclusions that the court came to in Havens because it was just a case where the court did not find standing. I think there may be other cases in the fair housing context that would be appropriate, but I think there are a number of circuit court cases where courts have found standing, including several in this court's precedence, where a challenge law practice has interfered with an organization's activities. They didn't suffer an informational injury. For example, La Raza. Or the RNC case from the Fourth Circuit. Let me ask you about the RNC case from the Fourth Circuit because it strikes me that that is squarely within the informational injury. As I understand that case, it specifically said that they were not able to determine from the information provided who was affected. That strikes me as an informational injury problem that the Fourth Circuit dealt with that is very different than the claims that you're making here. Can you address that? That is not how I read the Fourth Circuit case. It really is focused on the injury to the organization's ability to register and reach out to voters to mobilize them. Can I reference you to page 397 of the Fourth Circuit opinion? The Fourth Circuit said that voters are unable to ascertain which of the 225,000 people who may allege registered improperly will be able to vote in the upcoming election. That strikes me as an informational injury where they were impeded because they did not have the information of which of their clients could be registered. If a voter's registration is cancelled, you would know that it was cancelled. I think part of the injury that the plaintiffs suffer here is that because of the cancellation provision, they now have to change their registration activities to find out additional information from voters, namely whether or not they have multiple registrations, whether or not they have cancelled those registrations. I do think that to the extent that an informational injury is required, which I don't agree with. I don't think that's what the Fourth Circuit says. I'm not saying that an informational injury is the only way you can satisfy court business practices. That seems to be all that the Supreme Court has spoken on. When you said it makes it harder for you, I guess I wanted to reference back to Democratic votes because the Supreme Court specifically said at page 1563 is that according to the majority, according to the Medical Association, FDA has impaired their ability to provide services and achieve their organizational missions. That seems exactly like the argument you're making, and then the Supreme Court in the next sentence said that argument does not work to demonstrate standing. Can you parse out how your argument is different than the argument that the Medical Association were making, that the FDA impaired their ability to provide services and achieve their organizational missions? How do you have injury beyond that? The plaintiff organizations in Hippocratic Medicine argued that they had to spend more resources in order to lobby and advocate against the FDA's rule related to Mifepristone. Their injuries were solely related to lobbying and advocacy. They said, for example, they had to spend money to draft citizen petitions to lobby the public and educate the public. Here, our plaintiff organizations are not similarly situated. They are different because they actually do provide a service and the cancellation provision threatens to undo the service that they provide. It threatens to undo registrations that they secure and it requires them, as a result, to change their registration activities to ask to seek information from voters, find out whether or not they have multiple registrations, whether or not they have affirmatively cancelled those. That is an injury because they have to, that is their response to the cancellation provision, is to try to remedy the deficiency that is caused by the cancellation provision and that is additional evidence of the injury that is caused by it. Can I take you back, I know we're jumping around from cancellation to felony, but can we go back to the felony and I just, I want to get a sense from you as to why this would be unconstitutionally vague. It doesn't, your argument is that it would apply to voter registration efforts, but it doesn't say that. I mean, it talks about a mechanism for voting. So how do you view this as covering what your clients are doing? The felony provision cover, it prohibits knowingly providing a mechanism for voting to someone who's registered to vote in another state. That phrase mechanism for voting is not defined anywhere and the provision provides an example. It says that a mechanism for voting would include forwarding an early ballot to another person, but that is obviously not exhaustive. That is just an example and the legislature quite clearly knows how to criminalize activities related to ballots. So to the extent that the defendants view a mechanism for voting as being just limited to ballots, there are numerous provisions in the same section of the felony provision that use the word ballot. Mechanism for voting was used intentionally here. We think it is broader and it could include voter registration activities and the district court discussed and the defendants have discussed what mechanism means. It is a process for achieving a goal. We think that voter registration is a process for achieving the goal of being able to vote. Obviously you cannot vote in this country if you are not registered. I'm not sure I agree, but one response would be even if there's some ambiguity here, couldn't we construe it in a way that avoids this problem and then the challenge would fail on that basis? I think that we think there's a reasonable disagreement on the term mechanism for voting. The defendants have come up with varying definitions of the term throughout this litigation. It has changed. But to the extent that the court is inclined to adopt the panel's interpretation which restricts it to ballots and does not explicitly include voter registration activities, that would go a long way to ameliorating the harm to the plaintiff organization. That would be true whether it happens in the standing or the merits analysis. If we found that your injury is too speculative to challenge the felony provision because the law isn't susceptible of such a reading, you win by losing. I think that at the standing phase, I think we have met the burden of showing that there is a reasonable likelihood of prosecution. I particularly agree on a pre-enforcement challenge, though, that the absence of a disavowal of enforcement, we've repeatedly said, means that there is standing. Here we have essentially the opposite where we have an unequivocal disavowal of enforcement from the defendant. You haven't sued all the potential enforcers, but you are suing one enforcer, and that enforcer is saying we would not enforce it against the plaintiff because we interpret the statute differently. If a lack of disavowal is enough to essentially create injury, doesn't it have to be that such a disavowal then defeats it? Our concern is just that the disavowal has come through litigation. That's the norm. If there had been a disavowal outside of litigation, I think we would be in a different situation. I'm not sure the felony provision would still be at issue. This may be similar to Judge Johnstone's point, but doesn't it all just fall back a little bit on the wording of the statute? If the statute clearly covered voter registration and the Attorney General was in here saying, no, we disavow that, we're not going to actually prosecute that, I think it would be clear there would be standing notwithstanding the disavowal. I think the difficulty on the standing and the merits is that in candor, the merits of the vagueness challenge seem weak, and that starts to raise questions about is it so weak that it actually deprives you of standing? They kind of point in the same direction, but my point to this line of questioning is just to say that the disavowal I think is somewhat connected to the merits. If the merits were clearly in your favor, I don't know how much weight we would put on the disavowal. I understand that. I do think that in the context of pre-enforcement challenges that involve activities that are regulated under the First Amendment, there is a higher likelihood of finding standing because of the injury that results, and that is the chilling of the plaintiff's  to engage in voter registration, which is protected by the First Amendment. I understand that it's a different analysis, but what about the cancellation provision? Again, is anyone arguing here what you're arguing? Is there any other party in this case arguing what you're arguing, that the cancellation provision requires the cancellation of new rather than old registration? No defendant has said that with respect to the prong of the cancellation provision that requires county recorders to cancel registrations if they receive credible information that that can't operate to result in the cancellation of a newer registration. Our concern is, to be frank, primarily with that provision, which could allow for the cancellation of an Arizona registration based on the fact that someone had previously been registered in another state and had not affirmatively canceled those registrations. Our plaintiffs have submitted uncontested declaration testimony that makes it clear that their membership and their constituency involves voters who are mobile, who are young, who are college students, many of whom have retired in Arizona from other states and they have not affirmatively canceled their registrations in other states. The defendants have also said that if an Arizona county recorder received credible information from a third party and they did not cancel pursuant to the cancellation provision, then they would be in violation of another provision of Arizona law which requires them to maintain accurate voter rolls. This is a preliminary injunction still at this two and a half years on. Given that posture, again, if we decide that your injury is too speculative, set aside the organizational standing, just because there hasn't been a showing here that you face that threatened injury, a sufficient likelihood of that challenged injury, you can always come back if it actually happens. I don't think anyone's arguing that you wouldn't have standing to challenge that. At least that, I'm sorry, that at least the voter wouldn't have standing to challenge that. Again, you would end up winning by losing if we agree with your friends on the other side that the cancellation provision isn't and won't be used this way until we have something in the record that shows otherwise to sustain injunctive relief. I think that to the extent the court is inclined to adopt that interpretation, that does go a ways toward ameliorating our client's injuries with respect to the concern about registrations. I do think that the second, the defendants have not been clear with respect to the second prong of the cancellation provision. To the extent that an Arizona registration could be canceled or a county recorder would be required to cancel an Arizona registration based on one out of state, that is a non-speculative injury that our organizations have to respond to. What would you feel that the state would need to do on the cancellation side and on the felony provision side to address your concerns? I think that some interpretation that is binding on both of these provisions and that is issued outside of the context of litigation That says what? That says that one, the felony provision cannot be applied to voter registration activities. Mechanism for voting explicitly does not include voter registration activities. What if they use the language that they've already used, which I think is one better than what you're proposing, which is that mechanism for voting only applies to the forwarding of a voted or unvoted early ballot? I think that would be sufficient, Your Honor. The reason we have not gotten to that conclusion is because of the language of the statute. The language of the statute says that mechanism for voting includes forwarding an early ballot, which is not exhaustive language. It indicates that that is just an example of what a mechanism for voting is. Our understanding is that the term is more capacious. To the extent that we get a disavow that is enforceable and that limits the interpretation in the way that Your Honor stated, then I do think that would go a long way to ameliorating our plaintiff's injuries and the concerns and the reasons why we brought this up. Do you have any case law saying that a litigation to disavow is insufficient? Yes. The Lopez versus Condolele case, which is cited in our brief. I don't have the citation in front of me. Ms. Branch, to follow up the second part of going back to the Chief's question, now what would you need to get comfort with respect to the cancellation provision? I think the cancellation provision frankly is tougher specifically with respect to the second prong. That is something I think we could try to discuss. Our concern of course is that a valid Arizona registration would be canceled pursuant to that second provision. If the state is willing to state that that cannot happen, that would be a violation of Arizona law, then I think that might help to ameliorate our concern. What is that, just to be clear? That a county recorder cannot cancel a valid Arizona registration because an individual is registered in another state, because they receive quote-unquote credible information that an individual is registered in another state. Previous registration. It would essentially nullify the provision. Previous registration. A previous registration. Our concern is that Arizona county recorders won't necessarily have the information that they need. There wouldn't be anything wrong with Arizona canceling it if on January 1st they registered in Arizona and on February 1st they registered in California. The reason we brought this claim is because under the NVRA there is a requirement that a state registrar reach out to an individual to confirm that they have changed their residence before they cancel their registration. Our view is that the cancellation provision violates the NVRA because it only requires confirmation between county recorders. I think your friend on the other side, Mr. Samuels from the AG's office, indicated that the same process that's used for the change of address that's articulated in the EPM is utilized for this particular provision. Would you apply to an out-of-state change of address, not just an in-state? My understanding is that the provisions that are articulated in the EPM that have been referenced are with respect to moves within a county and that they're not related to moves to another state. The Secretary of State has explicitly stated that the second, the credible information prong of the cancellation provision does apply to interstate changes in residency. Okay. Thank you. Thank you, Your Honors. I guess the only one that had time left, is that why you're coming forward? Is that okay? That's fine. Go ahead. A few points on rebuttal. The first is related to the argument that the county recorder would apply to potentially out-of-state county recorders, and several Arizona statutes cut against that, 16-165, 16-166, and 152, talk about counties versus moves to other states, and the distinguishing between counties versus other states demonstrates that the use of the word county in the cancellation provision refers to in-state counties and interstate or in-state county recorders. And even if it was out-of-state, ARS 16-165A9 talks about what the county recorder must have on file in order to cancel an in-state registration based on a new out-of-state registration, and it talks about receiving a form. So I think that's a really important fact. The cancellation provision doesn't undo any plaintiff's work or their services. People are allowed to be registered at one place in Arizona, and if they update their registration, that's what the law says they have to do. There's no right to be registered multiple places in Arizona. County recorders also have what they need, because Arizona law requires that old and new registration forms are kept on file in the statewide database, and so those are available. There's not the confusion or guesswork that might have been present in the state of Arizona. And with that, Your Honors, we would respectfully request that this Court vacate the District Court's issuance of a preliminary injunction as to both challenge provisions. Mr. Janda, I'll give you a minute. Thank you, Your Honor. I just want to highlight, I think, two features of plaintiff's argument today that really demonstrate to me how incompatible their theory of standing is with the usual principles of standing that the Supreme Court has instructed courts to apply to organizations, justices, individuals. Number one, I think plaintiff's insistence that they don't have to show any impediment to their own legal rights is just incompatible with a number of Supreme Court cases that say you cannot generate standing by expending resources in response to conduct that doesn't itself injure you. It said that in Clapper, in the individual Hippocratic Medicine, in the organizational context. Mr. Janda, do you think Hippocratic Medicine is limited, limits Havens only to informational injuries? That's not how we've read Hippocratic Medicine, but I do think it makes clear that Havens needs to be limited to its context. And as I said earlier, I think an important feature of that context is the direct injury to Havens' own legal rights. And plaintiffs here, I think, have disavowed any sort of injury like that to their own legal rights. I don't think they've claimed any sort of legal right in how organizations, or in how voters are not able to maintain their registrations. And without that baseline legal right, they can't then spend their right of standing, just like an individual couldn't. And then, otherwise, briefly, I do want to highlight Plaintiff's discussion of law firms. I think the Supreme Court's discussion in Kowalski in footnote 5 just takes it as sort of an absurd premise that a lawyer would have an interest, an independent litigial interest, in the laws that affect his clients. And it cannot be that organizations of lawyers or law firms can get around those rules simply by banding together as an organization or as a law firm. I think the exact same thing is true here. An individual who helps other people vote has no interest in the rules that govern voter registrations. An organization that does the same thing, likewise, doesn't have any interest. Thank you. Mr. Samuels, I'll give you two minutes. Thank you very much, Your Honor. I appreciate it. I'd like to make one quick point on the felony provision before turning back to the cancellation provision. On the felony provision, I take it that the Court has focused quite a bit on the fact that the Attorney General's disavowal here has come in the context of this litigation. But I think it's important to evaluate closely the case law that has been cited on that front. If you look at Lopez, which plaintiffs have pointed to, and specifically the discussions on page 788, they do say that the government's disavowal must be more than a mere litigating position. But the case they cite for that is one in which the government had already brought charges, dropped them four days before the District Court hearing, and was prosecuting similar cases. So I think the fear here is gamesmanship, and that's an understandable one. There's just nothing like that here. This is quite different. As to the cancellation provision, I want to reiterate, listening to plaintiffs' arguments here, one of the first things they said is that the cancellation provision will increase the likelihood that voter registrations will be improperly canceled. That doesn't work. Clapper says that if you're talking about future injury, it must be certainly impending, and that the possible future injury is not sufficient. And, Judge Johnston, to your point, we're still at a preliminary injunction posture here, which I think further underscores that point. Now, I also want to turn to the suggestion that Havens is limited to informational injuries. That is also not how we have necessarily read it, and frankly, I think the Court just doesn't need to necessarily go that far to resolve this case. I think what the Court needs to do is make clear that to the extent this case relied on the frustration of mission diversion of resources test exclusively, that doesn't work anymore after Hippocratic Medicine. You need to apply the direct effect and interference with core business activities that Hippocratic Medicine laid out, but I don't think that that, and maybe that leads you to a conclusion in the end that it's only informational injuries, but I think the Court can let that play out in future cases, and I think this case can be resolved on narrower grounds than that, and we would encourage the Court to do that. Just before we end, how far apart do you think you are from the plaintiffs at this point? Well, it's kind of hard to tell because as Judge Johnstone was alluding to, we have the oddity in that they are urging these interpretations of the statute that I don't think they want and that we certainly don't want. I mean, I want to be absolutely clear. I mean, the Attorney General obviously does not want to see improper cancellation of voter registrations. We want no part of that, but our position is simply that the statute doesn't contemplate that at all. It certainly doesn't require it, and we believe it doesn't allow it, and so I don't know that we are that far apart, but I think what matters is that the provision is quite clear, and frankly, look, we would be more than happy to have an en banc opinion from this Court that says the cancellation provision doesn't mean that. Voter registrations cannot be canceled in that matter. Can we say that without reaching the merits? Or we would be constraining it that way in order to resolve standing? I think, and this gets at some of the dialogue we had earlier when I was up here, but I do think the Court can look at the statute and determine that there is not the injury that's alleged here because of the plain language of the statute itself. Thank you very much. Mr. Samuels, Ms. Olson, Mr. Janda, and Ms. Branch, thank you very much for your oral argument presentations here today. The case of Arizona Alliance for Retired Americans versus Kristen Mays, Yuma County Republican Committee and Katie Hobbs and the United States of America is now submitted and we are adjourned. Thank you. This Court for this session stands adjourned.
judges: MURGUIA, CALLAHAN, IKUTA, BENNETT, NELSON, BRESS, VANDYKE, SUNG, THOMAS, DESAI, JOHNSTONE